UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DOMINIC TAMPONE and
INTERNATIONAL COMMERCE
SOLUTIONS, INC.,

        Plaintiffs,

v.                                                    Case No. 10-11776
                                                      Honorable Patrick J. Duggan

GREGORY RICHMOND, ANDREW J.
BRODER, MERCHANT ASSURE SPECIALTY
PRODUCTS, LLC, RGS CONSULTING LLC,
f/k/A MERCHANT ASSURE INSURANCE
AGENCY, LLC, ROYAL GROUP SERVICES,
LLC., and RGS LIMITED LLC, d/b/a ROYAL
GROUP SERVICES, LTD.,

        Defendants.
_____/

## OPINION AND ORDER

Plaintiffs initiated this action against Defendants on April 30, 2010, asserting

numerous claims related to a limited liability company, Merchant Assure LLC

("Merchant Assure").  On August 17, 2010, Plaintiffs filed an amended complaint in

which they allege fourteen counts against Defendant Gregory Richmond ("Richmond"),

Defendant Andrew J. Broder ("Broder"), and/or the remaining defendants which are

entities associated with Richmond ("Richmond entities").  The counts are as follows:

    I.      Request for Court-Ordered Dissolution, pursuant to 6 Delaware
           Code Annotated § 18-802;

    II.     Request for Court-Ordered Accounting, Recovery of Assets, and
           Appointment of Receiver;

III.    Breach of Fiduciary Duties Owed to Merchant Assure brought by Tampone against Richmond;

IV.    Breach of Fiduciary Duties Owed to Tampone brought by Tampone against Richmond;

V.    Breach of Fiduciary Duties Owed to Merchant Assure brought by Tampone against Broder;

VI.    Conversion brought by Tampone against Richmond;

VII.    Conversion brought by Plaintiff International Commerce Solutions, Inc. ("ICS") against Richmond;

VIII.    Statutory Conversion brought by Plaintiffs against the Richmond Entities;

IX.    Misappropriation of Trade Secrets brought by Plaintiffs against Richmond and the Richmond Entities;

X.    Fraudulent Transfers brought by Plaintiffs against Defendants;

XI.    Unauthorized Merger brought by Tampone against Richmond and the Richmond Entities;

XII.    Breach of Limited Liability Company Agreement brought by Plaintiffs against Richmond;

XIII.    Bank Fraud brought by Tampone against Richmond;

XIV.    Declaratory Judgment brought by Tampone against Richmond.

(Doc. 21.) Richmond has filed a counter-claim against Plaintiffs.[1]  (Doc. 24.)

_____

[1]In his Counter-Complaint against Tampone and International Commerce Solutions, Inc., Richmond alleges the following claims: (1) declaratory judgment for a court ordered accounting of Merchant Assure; (2) misrepresentation/fraud; (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) breach of contract; (6) unjust enrichment; and (7) return of distributions from Merchant Assure pursuant to Delaware

(continued...)

Presently before the Court are the following motions:

1)   Plaintiffs' motion in limine to exclude evidence or testimony
     concerning the unsigned operating agreement for Merchant Assure
     as evidence of an "operating agreement", filed March 14, 2011 (Doc.
     48);

2)   Broder's motion for summary judgment pursuant to Federal Rule of
     Civil Procedure 56, filed March 15, 2011 (Doc. 49);

3)   Richmond's and the Richmond Entities' motion for partial summary
     judgment as to Counts III, IV, VI-XIV, filed March 15, 2011 (Doc.
     50);

4)   Plaintiffs' motion for partial summary judgment as to Counts III-V,
     filed March 15, 2011 (Doc. 52); and

5)   Plaintiffs' May 5, 2011 motion for reconsideration of this Court's April 22,
     2011 opinion and order denying their motion to file a second amended
     complaint (Doc. 80).

The motions have been fully briefed.  In addition, on August 1, 2011, Richmond and the

Richmond Entities (hereafter collectively "Richmond Defendants") filed a supplemental

brief in support of their partial summary judgment motion based on "newly discovered

evidence." (Doc. 83.)  Plaintiffs filed a response to this supplemental brief on September

1, 2011 (Doc. 84), and on September 2, 2011, a supplemental brief regarding litigation

recently filed in Michigan state court by JetPay Merchant Services LLC ("JetPay")

against Merchant Assure, Richmond, and Tampone.  (Doc. 85.)  On May 24, 2012,

Plaintiffs filed yet another supplemental brief in response to the Richmond Defendants'

--------

[1](...continued)
law.

August 1, 2011 pleading.

This Court held a motion hearing with respect to Plaintiffs' motion in limine and the parties' cross-motions for summary judgment on September 15, 2011. At the close of the hearing, the parties expressed an interest in pursuing mediation to resolve their dispute. The Court therefore delayed rendering a decision on the pending motions. On or about November 28, 2011, the Court was informed that the parties' settlement efforts were unsuccessful. Plaintiffs subsequently asked the Court for further hearing on the pending motions and a motion hearing was scheduled for January 24, 2012, but needed to be delayed due to Plaintiffs' counsel's medical emergency. The hearing eventually was conducted on May 9, 2012.

At the conclusion of the May 9 hearing, the Court asked Plaintiffs' counsel to submit a brief statement as to what amount of money Plaintiffs claim they are due from Merchant Assure. Plaintiffs filed a document in response to the Court's request on May 19, 2012, and an affidavit in support of their claimed damages on May 21, 2012. The Richmond Defendants responded to Plaintiffs' submission on May 29, 2012. Plaintiffs filed a reply brief on June 11, 2012.

## I.    Factual Background

Richmond is a Michigan licensed insurance agent. Since at least 1999, Richmond, through a number of different entities including the Richmond Entities, has been selling various merchant insurances policies to the banking industry, including "uncollectible

4

chargeback" insurance policies in connection with the credit card industry.[2]

Tampone, a New York resident, is the sole shareholder of ICS.  Together, they are in the technology business relating to the credit card industry.  Tampone claims to have developed software that allows insurance companies to limit risks in connection with "uncollectible chargeback" policies by early identification of troubled merchants engaging in unfavorable "chargeback" practices.

Broder is a Michigan resident and a licensed Michigan attorney.  Broder has served as counsel for Richmond and Merchant Assure.

Richmond and Tampone met sometime around 2003-2004.  At that time, Tampone informed Richmond that Tampone had developed certain proprietary computer software to monitor in "real time" credit card transactions and chargebacks in order to detect fraudulent chargeback claims and practices by customers and merchants.  Tampone represented that his software would allow insurance companies to limit risks in connection with "uncollectible chargeback" policies by early identification of troubled merchants who were engaging in unfavorable "chargeback" practices.

Richmond and Tampone subsequently formed Merchant Assure in August 2005, to sell "uncollectible chargeback" insurance policies which could be supported by

---

[2]"Chargeback insurance" refers to insurance coverage which protects merchants accepting credit cards.  The insurance protects the merchant against fraudulent transactions where use of the card is unauthorized and covers claims arising out of the merchant's liability to the issuing bank.  *See* http://en.wikipedia.org/wiki/Chargeback_insurance

5

Tampone's risk management software.  Richmond and Tampone are Merchant Assure's only members and they are equal (50%-50%) members.  Richmond, as the licensed insurance agent, was responsible for selling the insurance policies; Tampone, the technology person, was responsible for implementing and operating his computer software to monitor credit card transactions and "chargeback" data for the benefit of the insurance companies.  They formed Merchant Assure as a Delaware limited liability corporation.

In addition to Merchant Assure, Richmond has been involved in other insurance agencies, including Doeren Mayhew Risk Management and the Richmond Entities.  His involvement in some of those entities preceded Merchant Assure's formation and continued thereafter.  These agencies sell merchant insurance products to the banking industry and others, including "uncollectible chargeback" insurance policies.

Broder has provided legal representation to Richmond for more than fifteen years, including a period before Merchant Assure's formation.  Sometime in early 2006, Richmond asked Broder to draft an operating agreement for Merchant Assure.  Based on his conversations with Richmond, Broder prepared a draft agreement in January and February 2006.  Although Broder does not recall speaking with Tampone during the preparation of the draft operating agreement and his records do not reflect any conversations, Tampone testified during his deposition that he had four telephone conferences with Broder and Richmond related to the operating agreement.

According to Tampone, the first conversation was an introductory call.  The

6

second call was to determine if Broder would be an appropriate person to prepare the

operating agreement.  During the third conversation, Tampone believes he and Richmond

agreed to have Broder draft the agreement and they discussed certain components of the

agreement that was to be prepared.  According to Tampone, this included that he and

Richmond would be equal owners with equal voting rights, that Merchant Assure would

be managed like a partnership, how the bank account would be handled, and that the

entity would be formed in Delaware.  Finally, during the fourth conversation, which

occurred after Broder drafted the operating agreement, they discussed certain

modifications to the agreement.

     The agreement Broder prepared contained a clause relative to Richmond's and

Tampone's right to compete with Merchant Assure:

> Section 2.05.  <u>Independent Activities</u>.  Each Member may, notwithstanding
> the existence of this Agreement or any fiduciary relationship created
> hereby, engage in whatever activities he chooses, whether the same be
> competitive with the Company, the other Member or otherwise, without
> having or incurring any obligation to offer any interest in such activities to
> the Company or other Member, and neither this Agreement nor any activity
> undertaken pursuant hereto shall prevent any Member from engaging in
> such activities or require a Member to permit the Company or any other
> Member to participate in any such activities and, as a material part of the
> consideration for the execution hereof by the Members, each Member
> hereby waives, relinquishes and renounces any such right or claim of
> participation.

(Doc. 50 Ex. A.)  Richmond and Broder testified during their depositions in this case that

this provision was important to Richmond because, prior to forming Merchant Assure, he

had other businesses and contractual relationships with other insurance agencies,

including uncollectible chargeback policies.  It is undisputed that the operating agreement
drafted by Broder was never executed.

After its formation, Merchant Assure sold an uncollectible chargeback insurance
policy written by General Fidelity Insurance Company ("GFIC") to Merrick Bank.
Merrick Bank was a client of Richmond's prior to the formation of Merchant Assure.
(Doc. 50 Ex. N at 39-43; Ex. M at 34, 198.)  In fact Richmond, through his other
insurance entities, had sold insurance policies (including uncollectible chargeback
policies) to Merrick Bank prior to Merchant Assure's formation.  (*Id*.)  The insurance
policy Merchant Assure sold to Merrick Bank was essentially the only policy Merchant
Assure sold, as the remaining policies were immediately canceled because the insureds
failed to pay the first premiums.

In 2006, shortly after the policy was issued insuring Merrick Bank, Merrick Bank
purported to suffer a catastrophic loss under the policy.  Specifically, one of the
merchants covered by the policy, USN, incurred approximately $3 million in credit card
"chargebacks" and then closed for business.  GFIC eventually denied the USN claim.
Merrick Bank apparently had an indemnity agreement with JetPay for the loss; although,
JetPay claims that it was a secondary insured under the GFIC policy and entitled to
coverage.[3]

---

[3]Plaintiffs inform the Court that, on August 4, 2011, JetPay filed a lawsuit in
Michigan state court naming Merchant Assure, Richmond, and Tampone as defendants
and alleging that they are liable for failing to name JetPay as an insured entity on the
(continued...)

On March 22, 2008, GFIC indicated that it would likely cancel the GFIC Policy issued to Merrick Bank if Merrick Bank made a claim for the USN loss. Shortly thereafter, Merrick Bank made such a claim and GFIC sent a notice of cancellation of the policy. GFIC eventually denied the claim.

Merrick Bank subsequently purchased a new uncollectible chargeback insurance policy issued by the Ace Insurance Company. Defendant RGS Limited is the insurance agent for the policy.

In the meantime, Richmond claims that he became dissatisfied with Tampone shortly after Merchant Assure was created. This arose, in part, as a result of Tampone's refusal to provide Richmond access to Tampone's software and Tampone's unwillingness to sign Merchant Assure's tax returns or operating agreement. According to Richmond, his dissatisfaction came to a head when Tampone took a position opposite to Richmond's with respect to the Merrick Bank USN claim. Tampone sent communications to Merrick Bank and GFIC indicating that GFIC did not need to cover the claim; Richmond, in contrast, was attempting to encourage GFIC to provide coverage. As a result, Richmond retained Broder to seek a dissolution of Merchant Assure.

On May 9, 2008, Broder sent a letter to Tampone, indicating that Richmond wanted to dissolve Merchant Assure. (Doc. 50 Ex. D.) In that letter, Broder further informed Tampone with regard to Merchant Assure's assets:

---

[3](...continued)
GFIC policy issued to Merrick Bank. (Doc. 85.)

> In connection with the impending dissolution of Merchant Assure, Mr.
> Richmond has concluded that you will receive no further disbursements
> from the company . . . Upon completion of the dissolution process and the
> payment of all of Merchant Assure's obligations, Mr. Richmond will
> distribute any remaining funds in the manner that the company's funds have
> been paid historically. Mr. Richmond has transferred monies to a client
> trust account of Payne, Broder & Fosse, and P.C., for the purpose of paying
> bills.

(*Id.*) In fact, on May 14, 2008, Richmond transferred the money Merchant Assure had in

its Comerica Bank account ($145,000) to another Comerica Bank account to which

Tampone lacked access. The second account subsequently was closed at Richmond's

direction and the money was transferred to a client trust account at Broder's law firm.

Subsequent communications concerning Merchant Assure's dissolution ensued

between Broder, Tampone, and lawyers in Delaware hired separately by both Tampone

and Richmond; however no progress was reached. Plaintiffs eventually filed this lawsuit

seeking, in part, dissolution of Merchant Assure. In the meantime, Merchant Assure

received and made certain payments.

In May 2008, while Merchant Assure's funds remained in the second Comerica

account, Merchant Assure received a payment related to the GFIC policy for Merrick

Bank. Richmond forwarded a portion of this payment to GFIC and paid himself "[his]

50%." (Doc. 52 Ex. 2 at 132-133.) Richmond did not provide any portion of these funds

to Plaintiffs. (*Id.*)

In June 2008, after Richmond moved Merchant Assure's funds to the client trust

account at Broder's firm, Merchant Assure received a payment of approximately

10

$120,000 related to the GFIC policy for Merrick Bank.  (*Id*. at 127-129.)  Richmond sent

half of the payment to GFIC and deposited the remaining half in the client trust account at

Broder's firm.  (*Id*.)  Richmond subsequently directed Broder to make certain payments

allegedly for Merchant Assure's expenses from the trust account, including attorney fees

billed by Broder and reimbursements of Richmond's business-related expenses.  (*Id*., Ex.

10 at 101.)  During discovery, Defendants produced an accounting of the funds deposited

in and paid from the trust account.  (Doc. 49 Ex. 30.)

Further during this litigation, Defendants discovered that Tampone failed to file

and therefore pay state and federal income taxes on the $923,304.51 in distributions and

monies he received from Merchant Assure from 2005-2008.  The Richmond Defendants

also finally obtained a copy of Tampone's alleged proprietary software and hired experts

to examine the software.[4]  Based on their experience with merchant risk management

programs, these experts were "uninspired by what [they] saw."  (Doc. 50 Ex. F.)  As they

explained, in part:

> The functions/scripts appear to have been written by someone with a basic
> understanding of the processing industry, and the queries while valid, are
> rudimentary in nature. . . .
>
> As we have had extensive experience in putting together scripts of this

---

[4]The Richmond Defendants claim that "[a]lmost immediately after Merchant
Assure was created Richmond became . . . suspicious that Plaintiffs either did not have
the software they claimed to have or that the software did not do what Plaintiffs claimed it
could do."  (Doc. 50 at 8.)  The Richmond Defendants further claim that Richmond
repeatedly sought access to the software, but Tampone refused.  Richmond believed that,
if the software did what Tampone claimed, it would have identified the USN loss in 2006.

nature, we estimate that it would take us about 10 hours to put together
scripts of similar or improved efficacy. . . .

It is our opinion that a simple data "parsing" system such as the one on the
DVD [Plaintiffs' software] cannot effectively manage merchant risk . . .

(*Id.*)

## II.     Plaintiffs' Motion in Limine

In their motion in limine, Plaintiffs ask the Court to exclude evidence or testimony

concerning the unsigned operating agreement drafted by Broder as evidence of Merchant

Assure's operating agreement.  Because the agreement is unsigned, Plaintiffs argue that it

does not represent a meeting of Tampone's and Richmond's minds regarding the

formation and operation of Merchant Assure and therefore has no probative value.

Plaintiffs further argue that the admission of the unsigned agreement would be unduly

prejudicial to Plaintiffs because it contains provision(s) to which Tampone did not agree,

particularly the provision allowing Richmond to compete with Merchant Assure.

Plaintiffs argue that evidence concerning the operating agreement only is admissible "to

show the gross and improper behavior of Defendant Broder . . ."  (Doc. 48 at 1-2.)

The unsigned operating agreement constitutes hearsay without an exception

supporting its admission.  Richmond is capable of providing the best evidence regarding

the agreement he believes he reached with Tampone, just as Tampone can testify as to

what agreement he believes they reached.  Under Delaware law– which the parties agree

govern this action (although Plaintiffs nevertheless repeatedly cite to Michigan law in

their pleadings to support their arguments)– a "limited liability company agreement" is

12

defined as "any agreement (whether referred to as a limited liability company agreement,
operating agreement or otherwise), written, *oral or implied*, of the member or members as
to the affairs of a limited liability company and the conduct of its business." 6 Del. Code
Ann. tit. 6 § 18-101(7) (emphasis added).

The Court therefore is granting Plaintiffs' motion in limine.

## III.   Cross-Motions for Summary Judgment

### A.       Standard for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."
Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so one-sided that one party
must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52,
106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule
56(c) mandates summary judgment against a party who fails to establish the existence of
an element essential to that party's case and on which that party bears the burden of proof
at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of
material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the
"nonmoving party must come forward with 'specific facts showing that there is a genuine
issue for trial.'"  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587,
106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine

13

issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S. Ct. at 2513.

### B.   Plaintiffs' Claims Against Broder

Broder seeks summary judgment with respect to Plaintiffs' claims against him: Count II for a court-ordered accounting, recovery of assets, and appointment of receiver; Count V alleging breach of fiduciary duties owed to Merchant Assure; and Count X alleging fraudulent transfers.[5]

### 1.   accounting claim

In Count II of the First Amended Complaint, Plaintiffs allege that "Richmond has wrongfully transferred some or all of Merchant Assure's assets to [the Richmond Entities]" and that Richmond and/or Broder "have failed to account to Merchant Assure and/or Plaintiff Tampone for the assets removed from Merchant Assure and/or the profits derived from the improper transfer of Merchant Assure's assets by Defendant Richmond to [the Richmond Entities]." (Doc. 21 ¶¶ 72, 73,)

Broder demonstrates that Plaintiffs have now been provided an accounting of the funds in the client trust account. (Doc. 49 Ex. 30.) This includes a summary of deposits

---

[5]Accurately, according to Plaintiffs' First Amended Complaint, Count V is brought by Tampone, only, against Broder. Count X, in comparison, is brought by all Plaintiffs.

and withdrawals, bank account statements, and copies of checks written from the account. (*Id*.)  While, perhaps, earlier documents produced by Broder mistakenly included payments unrelated to Merchant Assure, Plaintiffs do not set forth a rationale basis to conclude that the accounting attached to Broder's motion is incorrect.  Plaintiffs also do not identify what additional information or records they need.

The Court therefore is granting summary judgment to Broder with respect to Count II of Plaintiffs' First Amended Complaint.

## 2.     breach of fiduciary duty and conversion claims

Plaintiffs allege in Count V of their First Amended Complaint that Broder breached his fiduciary duties to Merchant Assure and in Count X that Broder engaged in fraudulent transfers of Merchant Assure's monies.  As alleged in their complaint, Plaintiffs' claims are premised on Broder's alleged wrongful and fraudulent removal or conversion of assets belonging to Merchant Assure or facilitation of the same.[6]  (Doc. 21 ¶¶ 91, 134-137.)

Plaintiffs fail to present evidence suggesting that Broder's conduct in moving Merchant Assure's funds to his firm's client trust account and making payments at Richmond's direction breached any fiduciary duty to Merchant Assure.  Plaintiffs present no evidence to suggest that any payments were improper.  Even so, those payments were

---

[6]As discussed later, in their response to Broder's motion for summary judgment, Plaintiffs also assert that Broder breached his fiduciary duty by seeking the dissolution of Merchant Assure.

at Richmond's direction and there is nothing suggesting that Broder had any reason to believe that Richmond lacked the authority to make the payments on Merchant Assure's behalf.  Based on Plaintiffs' response to Broder's summary judgment motion, however, it is clear that what they really are asserting is that Broder breached fiduciary duties to Tampone, personally, as a 50% owner of Merchant Assure.

The Michigan Court of Appeals has held that, because a corporation exists as an entity apart from its shareholders, the client of a corporation's attorney is the corporation and not the shareholders.  *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 107 Mich. App. 509, 514-15, 309 N.W.2d 645, 648 (1981).  Although no attorney-client relationship exists between a corporation's attorney and its shareholders, the Michigan Court of Appeals in *Fassihi* found that "this does not necessarily mean that [the corporate attorney] had no fiduciary duty to [the shareholder]."  *Id*.  The court indicated that "[a] fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice."  *Id*. at 515, 309 N.W.2d at 648.  Plaintiffs contend that the facts of this case our indistinguishable from those in *Fassihi*, that Broder (like the corporate attorney in *Fassihi*) owed a fiduciary duty to Tampone, and that Broder (like the corporate attorney in *Fassihi*) breached that duty.

As an initial matter, Plaintiffs set forth no facts to establish a basis for Tampone's belief that Broder would treat him with the same degree of loyalty and impartiality extended to Richmond.  Unlike the plaintiff in *Fassihi*, Tampone was aware that Broder represented Richmond and Richmond's businesses well before Tampone and Richmond

16

set off to form Merchant Assure.  Further, Tampone acknowledged during his deposition that the only services Broder provided to Merchant Assure that were "personal" to Tampone was the drafting of the operating agreement in 2006.  (Doc. 49 Ex. 6 at 358-59.) But even if a fiduciary relationship arose between Broder and Tampone, Plaintiffs fail to establish a breach of any duty arising from that relationship.

Unlike the attorney in *Fassihi*, Broder did not oust Tampone from Merchant Assure.  Broder only attempted to negotiate a dissolution of Merchant Assure.[7]  Because his attempts were unsuccessful, Tampone has not been damaged.  While Broder did aid Richmond in moving Merchant Assure's monies to a client trust account maintained by Broder's law firm, Plaintiffs lack evidence to support their contention that Broder did so with the plan of denying Tampone his portion of those funds.[8]  (*See* Doc. 64 at 14.) Plaintiffs point to Broder's statement in his May 9, 2008 letter to Tampone that "Tampone will receive no further disbursements from the company . . .." (Doc. 66 at 12.) Plaintiffs, however, omit the end of the sentence: ". . . at this time. (Doc. 49 Ex. 14.) Further, Broder continues in his letter: "Upon completion of the dissolution process and

---

[7]Notably, Plaintiffs do not identify and the communications from Broder concerning the dissolution do not suggest that anything in Broder's proposal for Merchant Assure's dissolution was unfair to Tampone. (*See, e.g.*, Doc. 49 Ex. 24.)

[8]In their response brief, Plaintiffs also state that "Broder took monies from Merchant Assure, placed these monies in his Client Trust Account, [and] failed to inform Tampone." (Doc. 64 at 14.)  The evidence, however, does not support Plaintiffs' version of events.  Broder did not take Merchant Assure's monies from the Comerica account, Richmond did.  Further, in his May 9, 2008 letter, Broder specifically informed Tampone that this was being done. (*See* Doc. 49 Ex. 14.)

the payment of all of Merchant Assure's obligations, Mr. Richmond will distribute any remaining funds [in the trust account] in the manner that the company's funds have been paid historically." (*Id.*)

Finally, Plaintiffs argue that Broder breached his fiduciary duties to Tampone by paying Richmond and himself from the monies in the client trust account. Plaintiffs fail to demonstrate, however, that these payments (or transfers) were fraudulent rather than legitimate business expenses owed by Merchant Assure.

For these reasons, the undisputed evidence does not support Tampone's claims alleging breach of fiduciary duty (Count V) or fraudulent transfer (Count X) against Broder. Plaintiffs' claim for an account from Broder (Count II) is moot. Broder is entitled to summary judgment and is dismissed as a defendant from this lawsuit.

### C.    Plaintiffs' Claims Against Richmond and/or the Richmond Entities

In their pending motion, Plaintiffs seek summary judgment with respect to Counts III-V of their First Amended Complaint. The Court disposed of Count V in the preceding section. Count III, brought by Tampone, alleges that Richmond breached the fiduciary duties he owed to Merchant Assure. Count IV, also brought by Tampone, alleges that Richmond breached the fiduciary duties he owed to Tampone. In their pending motion, the Richmond Defendants seek summary judgment with respect to Counts III and IV, as well as Counts VI through XIV.

#### 1.    breach of fiduciary duty claims based on competing conduct

Tampone alleges that Richmond breached his fiduciary duties to Merchant Assure

18

and Tampone (Counts III and IV, respectively) by competing with Merchant Assure, including taking Merchant Assure's only client (Merrick Bank) for one of the Richmond Entities (RGS Limited).

The Richmond Defendants argue that these claim are barred by the applicable three-year statute of limitations, Michigan Compiled Laws § 600.5805. "'A claim of breach of fiduciary duty or breach of trust accrues when the beneficiary knew or should have known of the breach.'" *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 47, 698 N.W.2d 900, 908-09 (2005) (quoting *Bay Mills Indian Cmty. v. Michigan*, 244 Mich. App. 739, 751, 626 N.W.2d 169 (2001)).

According to the evidence presented by the Richmond Defendants, on April 10 and 11, 2007, Tampone met with Robert Halsey in Albany, New York, at which time Halsey made Tampone aware that Richmond was selling merchant insurance products to the banking industry through other entities. (Doc. 50 Ex. M at 512; Ex. O at 31-32.) As Tampone stated during his deposition, one of the things raised during his meeting with Halsey in Albany was that "Richmond was out possibly competing with Merchant Assure on other products." (*Id*. Ex. M. at 512.) When directly asked "[w]hen did you first become aware that it was possible that Mr. Richmond was competing against Merchant Assure with similar or other products," Tampone answered: "I believe, to the best of my recollection, the first time I really became aware of it was when Mr. Halsey came to Albany, New York to meet with me." (*Id*.) Tampone cannot create a genuine issue of fact through his subsequent affidavit contradicting his deposition testimony. *See Aerel,*

19

*S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006).

Plaintiffs filed this lawsuit on April 30, 2010. As set forth above, the evidence establishes that, on April 10 or 11, 2007, Tampone knew or should have known about Richmond's competition with Merchant Assure through his other businesses. Tampone's breach of fiduciary claims against Richmond (Counts III and IV), to the extent those claims are based on this conduct, are time-barred.

Merchant Assure lost Merrick Bank as a customer in 2008, and thus Plaintiffs' claim that Richmond breached his fiduciary duties to Tampone and/or Merchant Assure by "stealing" this client for RGS is not time-barred. Nevertheless, the undisputed evidence establishes that Merrick Bank purchased uncollectible chargeback insurance policies from entities owned by Richmond before Merchant Assure was formed. (Doc. 62 Ex. J at 33-34.) Moreover, Merrick Bank only entered a new insurance policy purchased through RGS after GFIC cancelled the policy Merrick Bank had through Merchant Assure. Plaintiffs, therefore, are not entitled to the damages they seek based on the payments Merrick Bank has paid RGS (in other words, RGS' profits from Merrick Bank's business). (*See* Doc. 96 at 7-9.)

### 2. claims based on Richmond's transfer of Merchant Assure's funds

Plaintiffs allege that Richmond breached his fiduciary duties to Tampone and Merchant Assure (Counts III and IV, respectively) and engaged in unlawful or fraudulent conversion or merger (Counts VI-VIII, X-XI) when Richmond moved Merchant Assure's

20

funds to the client trust account maintained by Broder's law firm and then directed

payments from those funds.  Richmond contends that the money was used to pay

legitimate Merchant Assure expenses.  Plaintiffs maintain that "[t]his is a blatant

falsehood."  (Doc. 72 at 3 (emphasis removed).)

The Richmond Defendants seek summary judgment with respect to Plaintiffs'

claims based on Richmond's managing of Merchant Assure's funds, arguing first that

Plaintiffs cannot maintain a conversion claim for money unless they can show that there

was a duty to pay Plaintiffs the specific money collected and deposited into Broder's

client trust account.  (Doc. 50 at 14 (citing *Warren Tool Co. v. Stephenson*, 11 Mich. App.

274, 111 N.W.2d 133 (1968).)  The Richmond Defendants argue that the monies

belonged to Merchant Assure, not Plaintiffs.  The Court cannot conclude that this

argument entitles the Richmond Defendants to summary judgment, however.  There is no

dispute that Tampone had a fifty percent ownership interest in Merchant Assure,

including its assets.  If Richmond was squandering Merchant Assure's assets or using

those assets to pay expenses not owed by Merchant Assure, it seems that he was

converting property that ultimately might have belonged to Tampone.

The Richmond Defendants further argue, however, that Tampone would not be

entitled to any money allegedly converted by Richmond to himself or the Richmond

Entities because Merchant Assure would have expended that money to cover its liability

for Tampone's unpaid federal and state income taxes.  As Plaintiffs acknowledge, a claim

for conversion only can be established where "there was an obligation on the defendant's

21

part to return the monies [to the plaintiff]." (Doc. 67 at 10 (citing *Check Reporting Servs., Inc. v. Michigan Nat'l Bank-Lansing*, 191 Mich. App. 614, 626, 478 N.W.2d 893, 900 (1991).)

It is undisputed that Merchant Assure paid Tampone $923,304.51 in distributions and other monies between 2005-2008. At his deposition in this case, Tampone invoked the Fifth Amendment in response to most questions concerning his federal and state taxes. Nevertheless, and in part as a result of that invocation, it is further undisputed that Tampone never filed federal or state income tax returns or paid taxes on the money from 2006 forward. (Doc. 50 Ex. M. at 426-436); *see also Tolliver v. Federal Republic of Nigeria*, 128 Fed. App'x 469, 471 (6th Cir. 2005) (affirming the district court's striking of the plaintiff's affidavit after he invoked the Fifth Amendment to shield himself from questioning during pre-trial discovery). Under Michigan law, Merchant Assure and perhaps Richmond are liable for the unpaid taxes ($40,163.74 according to the Richmond Defendants' calculation), plus interest and penalties. *See* Mich. Comp. Laws § 206.351. Plaintiffs do not contest the Richmond Defendants' claim. For the reasons set forth below, this tax liability offsets any amount that could possibly be due to Tampone from Merchant Assure's account.

Plaintiffs contend that Richmond wrongfully transferred $452,010.24 from Merchant Assure's account. (Doc. 96 at 3.) This amount, however, includes $141,216.20 in premium payments that Merrick Bank made for the RGS policy. (Doc. 101 Ex. 3.) The money did not belong to Merchant Assure; rather it belonged to RGS. It was

accidentally wired to Merchant Assure's bank account, but subsequently sent to RGS's account.  (*Id*. Ex. 4.)  Plaintiffs' figure also includes a payment to Richmond for $25,000 on March 14, 2008.  (Doc. 96 at 3.)  This payment represents a 50% distribution to Richmond for Merchant Assure's March 2008 net income.  Two weeks later, on April 1, 2008, an identical distribution was made to Tampone.  (Doc. 101 Ex. 6.)  Defendants show that an additional $146,027.36 should be reduced from Plaintiffs' calculation, as this amount reflects the last two net premium payments owed to GFIC in connection with the Merrick Bank policy.  (*Id*. Exs. 7, 8.)

Finally, Defendants demonstrate that between March 2008 and May 2012, Richmond, from Merchant Assure's account or his own pocket, paid third-parties $167,663.82 for Merchant Assure's legitimate business expenses.  (Doc. 101 at 4-6.) This includes the following payments from Merchant Assure's account: $22,755.49 in legal fees to Broder for negotiating a tolling agreement with Merrick Bank and attempting to resolve the USN claim (*id*. Ex. 2); $14,137.05 in legal fees for other lawyers related to the same claim (*id*.); $10,150.00 to Merchant Assure's accountants for tax return preparation (*id*.); $10,557.00 to the State of Michigan for Merchant Assure's 2008 state business taxes (*id*. Ex. 9); $500 to the United States Treasury for a late fee for the filing of Merchant Assure's 2006 federal income tax return (*id*. Ex. 10); $11,360.00 to State Strategies Company related to the resolution of the USN claim (*id*. Ex. 11); $36,653 to several insurance companies in connection with Merchant Assure's 2008 business insurance policies, including its workers compensation insurance policy, errors and

23

omissions policy, and umbrella policy (*id*. Ex. 2); $823.28 for bank charges (*id*.); and

$2,000.00 to pay the monthly salary between March and June 2008 of Merchant Assure's

bookkeeper.  (*Id*. Ex. 12.)  It also includes $58,728.00 that Richmond personally paid in

connection with Merchant Assure's errors and omissions policies.  (*Id*. Exs. 13, 14.)

Subtracting the above amounts from Plaintiffs' claimed damages and factoring in

Merchant Assure's tax liability due to Tampone's nonpayment results in their being no

obligation on Defendants' part to return any monies to Tampone.  Therefore, the Court

concludes that the Richmond Defendants are entitled to summary judgment with respect

to Plaintiffs' claims related to Richmond's transfer and expenditures of Merchant

Assure's funds (Counts III, IV, VI-VIII, X-XI).

### 3.    misappropriation of trade secrets claim

Plaintiffs allege that the Richmond Defendants misappropriated Merchant Assure's

"trade secrets" (Count IX).  Under Michigan's Uniform Trade Secrets Act, a "trade

secret" is defined as:

> d) . . . information, including a formula, pattern, compilation, program,
> device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by proper means
> by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to
> maintain its secrecy.

Mich. Comp. Laws § 445.1902. The Richmond Defendants seek summary judgment with

respect to this claim, arguing that Plaintiffs fail to identify with any specificity a "trade

24

secret."

In response, Plaintiffs argue that the Richmond Defendants misappropriated "the 'process' offered by Merchant Assure . . . includ[ing] taking data, setting up parameters, filtering that data and performing very valuable and sought after risk management based upon that data." (Doc. 67 at 13.) When asked at his deposition, however, Tampone was not able to identify exactly what risk management tools he believes the Richmond Defendants are using that were misappropriated from Plaintiffs. (Doc. 50 Ex. M. at 275-77.) In fact, he testified that he did not even know whether the Richmond Defendants had misappropriated any trade secrets and was relying on discovery to make that determination. (*Id*. at 274.) Discovery has concluded. Plaintiffs, nevertheless, fail to provide any further specificity in response to the Richmond Defendants' summary judgment motion.

The Court therefore finds that Plaintiffs fail to present evidence to support their misappropriation of trade secrets claim (Count IX).

### 4.    breach of contract claim

Plaintiffs allege that Richmond breached Merchant Assure's limited liability agreement (Count XII). Specifically, Plaintiffs claim that Richmond breached his and Tampone's agreement that they would share Merchant Assure's profits equally. As demonstrated above, however, Tampone has not shown that he would have been entitled to any of the monies Richmond expended from Merchant Assure's accounts after accounting for the company's liability for his unpaid taxes.

25

### 5.      bank fraud

Finally, Tampone alleges that Richmond engaged in bank fraud when he informed representatives at Comerica that Tampone no longer was a "beneficiary" of Merchant Assure and transferred Merchant Assure's assets to an account to which Tampone had no access and then to the client trust account at Broder's law firm (Count XIII).  The parties agree that Plaintiffs must make the following showing to succeed on this claim: (1) that Richmond made a material representation; (2) that it was false; (3) that when Richmond made the representation, he knew it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by Tampone; (5) Tampone, in fact, acted in reliance upon it; and (6) Tampone thereby suffered injury.  *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976).

Plaintiffs lack evidence to demonstrate that the alleged misrepresentation was made.  Moreover, they fail to allege a misrepresentation relied on by *Tampone*, as compared to Comerica's representatives.  Finally, for the reasons discussed above, Plaintiffs cannot demonstrate that Tampone suffered damages as a result of the alleged misrepresentation.

Richmond therefore is entitled to summary judgment with respect to Count XIII.

### 6.      declaratory judgment

In Count XIV of the First Amended Complaint, Tampone seeks a declaratory judgment against Richmond declaring: (1) that Richmond is prohibited from making any

26

unilateral decisions or taking any action on behalf of Merchant Assure in regard to its

dissolution or distribution of its assets; (2) that Tampone is entitled to at least fifty percent

of the value of the assets of Merchant Assure, including assets wrongfully transferred to

Richmond and/or other entities; and (3) that any assets and property rightfully belonging

to Merchant Assure and/or Tampone, must be immediately returned and restored to

Merchant Assure and/or Tampone for proper distribution.

       For the reasons already discussed, the Court cannot find that any assets have been

wrongfully transferred by Richmond from Merchant Assure and/or Tampone.  Thus to the

extent Tampone seeks a declaration as to the unlawfulness of Richmond's conduct which

is the basis of Plaintiffs' other claims and/or a declaration that Tampone is entitled to

damages or certain monies as a result of Richmond's conduct, the Court concludes that

Tampone is not entitled to relief.  Plaintiffs fail to establish a justification for the

additional declaration requested (i.e. prohibiting Richmond from making unilateral

decisions or taking unilateral actions respecting Merchant Assure pending dissolution).[9]

The Court therefore is granting summary judgment to Richmond with respect to Count

XIV as well.

## IV.    Plaintiff's Motion for Reconsideration

       On March 15, 2011, Plaintiffs filed a motion to file a second amended complaint.

---

    [9]The Court notes, however, that both parties seek a dissolution and a court-ordered accounting of Merchant Assure.  Until this can be effectuated, it appears to this Court that it would be in the parties' best interests to retain Merchant Assure's status quo.

Plaintiffs sought to add a claim against Broder and Richmond alleging civil conspiracy and a claim against Broder for legal malpractice.  On April 22, 2011, this Court issued an opinion and order denying Plaintiffs' motion.  The Court concluded that Plaintiffs were aware of facts to support their proposed amendments well before they sought to file their amended claims and that therefore they engaged in undue delay in filing their request.  The Court further concluded that the opposing party would suffer prejudice if the amendment were allowed as the request came after the close of discovery and the filing of dispositive motions.  Plaintiffs timely moved for reconsideration of the Court's decision.

In their motion for reconsideration, Plaintiffs contend that there was no undue delay.  Plaintiffs argue that, "[w]hile the Plaintiffs did know that monies were transferred into Broder's client trust account," they "only recently confirmed . . . the method of Broder's management of those monies."  (Doc. 80 at 3.)  Plaintiffs further argue that the Court's finding of prejudice is negated by the allowance of further discovery and the magistrate judge's ruling allowing Richmond to amend his counter-claim

The Court is not convinced that it committed a palpable defect when it denied Plaintiffs' motion to file a second amended complaint.  Moreover, having now analyzed Plaintiffs' claims against Broder, the Court would further deny Plaintiffs' previous request to amend their claims against him based on futility.  Further, because the Court is granting Broder's motion for summary judgment and dismissing him as a party to this lawsuit, the undue prejudice previously found by the Court is *not* negated by the additional discovery that will be allowed between the remaining parties.  The Court

28

therefore is denying Plaintiffs' motion for reconsideration (Doc. 80).

**V.      Conclusion**

For the reasons discussed, the Court concludes that Plaintiffs' motion in limine should be granted but their motion for reconsideration and motion for sanctions should be denied.  The Court further concludes for the reasons discussed that Broder is entitled to summary judgment with respect to Plaintiffs' claims against him and should be dismissed from this lawsuit and that the Richmond Defendants are entitled to summary judgment with respect to Counts III, IV, and VI-XIV.

Accordingly,

**IT IS ORDERED**, that Plaintiffs' motion in limine (Doc. 48) is **GRANTED**;

**IT IS FURTHER ORDERED**, that Plaintiffs' motion for reconsideration (Doc. 80) is **DENIED**;

**IT IS FURTHER ORDERED**, that Plaintiffs' motion for partial summary judgment as to Counts III-V of their First Amended Complaint is **DENIED**;

**IT IS FURTHER ORDERED**, that Defendant Andrew Broder's motion for summary judgment is **GRANTED**.  Count V of Plaintiffs' First Amended Complaint is **DISMISSED WITH PREJUDICE** and Defendant Broder is **DISMISSED AS A PARTY** to this lawsuit;

**IT IS FURTHER ORDERED**, that the Richmond Defendants' motion for partial summary judgment is **GRANTED** and summary judgment is granted as to Counts III, IV,

29

VI-XIV.

Date:  January 9, 2013                    s/PATRICK J. DUGGAN
                                          UNITED STATES DISTRICT JUDGE

Copies to:
Dana L. Ramsay, Esq.
Robert C. Davis, Esq.
Allen M. Wolf, Esq.
Jason S. Conti, Esq.
Theresa M. Asoklis, Esq.